J-S26001-23
J-S26002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.G.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.D.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1118 EDA 2023 |

Appeal from the Decree Entered April 18, 2023
In the Court of Common Pleas of Northampton County
Orphans' Court at No: A2022-0119

| | | |
|---|---|---|
| IN RE: L.G.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1119 EDA 2023 |

Appeal from the Decree Entered April 18, 2023
In the Court of Common Pleas of Northampton County
Orphans' Court at No: A2022-0119

BEFORE: STABILE, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:  **FILED SEPTEMBER 13, 2023**

K.D.M. ("Father") and R.B. ("Mother") (collectively, "Parents") appeal from the April 18, 2023 decrees involuntarily terminating their parental rights to their daughter, L.G.M.M. ("Child"), born in August 2020, pursuant to the

J-S26001-23
J-S26002-23

Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After review,

we affirm.

The orphans' court set forth the following findings of fact:

. . .

13. This family's history with the Agency began [on July 27], 2020 when [Northampton County Children, Youth and Families ("the Agency")] received a General Protective Services ("GPS") referral alleging Father used inappropriate discipline on [Child]'s half-sister, S.E.M., as he slapped the then three-year-old child three times.[2]  At that time Mother was pregnant with Child and she reported that she suffers from untreated depression and bipolar disorder.  Mother also had a history of substance abuse and a criminal record (theft and disorderly conduct).

14. [On September 1, 2020, the Agency received a subsequent GPS referral.]  After Child's birth [in August 2020], her meconium was tested for drugs and tested positive for marijuana.  [As a result of additional concerns, t]he Agency [further] conducted an assessment for possible methamphetamine use, domestic violence [], lack of supervision and discipline of children, and inadequate provision of basic needs.

15. [Also of concern,] Father was found to have an indicated status on the Childline Registry for sexual abuse in the form of a sexual assault of a 4-year-old child.  While babysitting the child, Father rubbed his penis on the child's private area while both he and the child were unclothed.  The indicated report was dated 5/1/2012.  Agency Exhibit 8.

16. On September 1, 2020, the Agency implemented a safety plan which prohibited Father from having any unsupervised contact with Child.  Mother's friend, D.F., was named as supervisor under the terms of the safety plan.

_____

[1] Mother and Father raise similar issues for our consideration, which arise from the same set of facts.  As such, we review their appeals together.

[2] At the time of the subject proceeding, it was reported that S.E.M. resided with her father.  N.T., 3/20/23, at 54.  S.E.M. is not a subject of these appeals.

17. On September 8, 2020, Mother walked in on Father engaged in a sex act with [a third party], who was not a willing participant. The family friend quit as supervisor of Father. The safety plan was modified to permit Mother to supervise Father's contact with Child.

. . .

21. The Agency filed an adjudication petition seeking a protective services order on 9/22/2020, with a hearing to occur within 10 days.

22. The court continued the adjudication hearing three times.

23. Pursuant to a petition for emergency custody, Child was removed from the care of parents on 1[2]/1/2020, based on parents' violations of the safety plan that was extended by the continuance orders, as well as Mother's apparent lack of protective capacity in regard to allowing Father unsupervised contact with the newborn child.

24. Child was adjudicated dependent on December 3, 2020, based on concerns of parental substance abuse, untreated mental health, lack of supervision/discipline, inadequate basic needs and Father's previous child sexual assault on a 4-year-old that resulted in an indicated report with Childline. Care and custody of Child was granted to the Agency with placement with non-relative kinship foster mother.

25. The permanent placement goal was return to parent or guardian. [3]

26. Following the adjudication hearing, the court issued a Permanency Plan/Court Directive and Interim Order directing Father to cooperate with a sex offender's evaluation and follow all recommendations, participate in and successfully complete a drug and alcohol evaluation and follow through with all recommendations, including the signing of appropriate releases, cooperate with random drug screening, cooperate with in-home

---

[3] The court additionally established a concurrent goal of adoption. *See* Order of Adjudication and Disposition-Child Dependent, 12/3/20, at 4. As we observe that there is no docket with the dependency record, we cite to orders from the dependency record herein by their date.

services, demonstrate stability by maintaining stable, legitimate income and housing for a period of at least six months, and notify the Agency within twenty-four hours of any change in residence.

. . .

32. On December 3, 2020, the court issued a Permanency Plan/Court Directive and Interim Order directing Mother to cooperate with a protective parenting evaluation and all recommendations, cooperate with random drug screening, cooperate with in-home services, demonstrate stability by maintaining stable, legitimate income and housing for a period of at least six months, and notify the Agency within twenty-four hours of any change in residence. [4]

. . .

62. Child has been placed in foster care from December 3, 2020, to the present.

63. Child has been in the pre-adoptive kinship foster care home with her adult half-brother, [D.M.], and his girlfriend, [A.S.], since April 20, 2022.

. . .

Findings of Fact and Conclusions of Law, 4/18/23, Findings of Fact (cleaned up) (internal punctuation and capitalization also corrected).

Thereafter, throughout the ensuing dependency proceeding, the court conducted permanency review hearings at regular intervals. The court consistently characterized Parents' compliance with the permanency plan as moderate. The court further maintained Child's commitment and placement.

---

[4] Mother was later ordered to complete a drug and alcohol evaluation. **See** Permanency Plan/Court Directive and Interim Order, 3/25/21, at ¶ 8.

On December 13, 2022, the Agency filed petitions for the involuntary termination of Parents' parental rights. The orphans' court held an evidentiary hearing on March 20, 2023. At the time, Child was two and a half years old. Parents were each present and represented by counsel. Child was represented by her guardian *ad litem* ("GAL") from the underlying dependency matter, Henry Newton, Esquire.[5] The Agency presented the testimony of several witnesses affiliated with Dynamic Counseling Associates, who were accepted as experts in sex offender treatment and/or forensic counseling without objection: Alyson Wogenrich, licensed marriage and family therapist and certified sex offender treatment provider, who provided treatment to Father;[6] Lindsay Fleischman, licensed professional counselor, clinically certified forensic counselor, and certified sex offender treatment specialist, who

---

[5] Insomuch as Child's legal interests were incapable of ascertainment due to her young age, we find Section 2313(a) satisfied with the representation of Attorney Newton. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

We note that Attorney Newton argued in favor of termination. *See* N.T., 3/20/23, at 82. He, however, did not submit a brief to this Court.

[6] Ms. Wogenrich's reports, dated March 10, 2021, and March 8, 2022, were admitted as Agency Exhibits 2 and 3, respectively. *See id.* at 14.

completed a sex offender evaluation of Father;[7] and Jamie Wagaman, licensed marriage and family therapist, certified clinical forensic counselor, and certified sex offender treatment specialist, who conducted a protective parenting evaluation of Mother.[8]    The Agency additionally presented caseworker, Janel Fortun.  Parents then each testified on their own behalf.

By separate decrees dated and entered April 18, 2023, the orphans' court involuntarily terminated Parents' parental rights to Child.  The court issued a contemporaneous Findings of Fact and Conclusions of Law.

Thereafter, on April 27, 2023, Mother, through appointed counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On May 2, 2023, Father, through appointed counsel, filed a timely notice of appeal, along with a concise statement of errors complained of an appeal.  On May 11, 2023, the orphans' court issued a Rule 1925(a) opinion referencing its Findings of Fact and Conclusions of Law.

On appeal, Father and Mother request that we review whether the orphans' court erred and/or abused its discretion with respect to 23

---

[7] Ms. Fleischman's report, dated October 11, 2020, was admitted as Agency Exhibit 5.  ***See id.*** at 32.

[8] Ms. Wagaman's report, dated September 21, 2020, was admitted as Agency Exhibit 7.  ***See id.*** at 49.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). **See** Father's Brief at 5-6; Mother's Brief at 4-5.

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. **See Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." **In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.**

The involuntary termination of parental rights is governed at statute by Section 2511 of the Adoption Act, which requires a bifurcated analysis. **See** 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. **See In re T.S.M.**,

71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (citation omitted).

In the case *sub judice*, the orphans' court terminated Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004). Instantly, we will analyze the court's termination decrees pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

- 8 -

> of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (quoting *In re*

***Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa. Super. 2015)) (internal citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." ***Matter of Adoption of M.A.B.***, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re S.C.***, 247 A.3d 1097 at 1105 (citation omitted).

Preliminarily, we note that Father baldly asserts that he was "substantially compliant" and that "'periods of noncompliance' and instances of 'missed' appointments do not rise to [the] significant and heightened standard" of clear and convincing evidence required for termination. Father's Brief at 14. Similarly, Mother proclaims that she has "developed insights" and "made progress" without elaboration. Mother's Brief at 17. As such, we conclude that any assertion of error as to Section 2511(a)(2) is waived for failure to address this issue in a meaningful way or to develop it in a meaningful fashion with citation to pertinent legal authority and/or reference to the record. ***See*** Pa.R.A.P. 2119(a)-(d); ***see also In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting ***In re A.C.***, 991 A.2d 884, 897 (Pa. Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); ***see also In re***

- 10 -

**M.Z.T.M.W.**, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

Even if not waived, Parents' claims are without merit. In concluding that the Agency satisfied the statutory grounds to terminate Parents' parental rights pursuant to Section 2511(a)(2), the orphans' court found as follows: "The repeated and continued neglect and refusal of Mother and Father has caused [Child] to be without essential parental care, control and subsistence necessary for her physical or mental well-being, and the conditions and causes of the neglect and refusal will not be remedied by Mother and Father." Findings of Fact and Conclusions of Law, 4/18/23, Conclusions of Law, at ¶ 2 (citation omitted). The court noted Parents' failure to successfully secure stable employment and housing, and to complete recommended sex offender treatment and protective parenting treatment. **See id.**, Findings of Fact, at ¶¶ 38, 39, 40, 42, 43, 48, 55, 56, 57, 58.

Upon review, the record supports grounds for termination under Section 2511(a)(2). While Parents baldly assert substantial compliance and progress, the record reveals that Parents failed to complete their goals toward reunification. Significantly, as noted *supra*, Father was required, *inter alia*, to complete a sex offender evaluation and treatment, and to maintain a stable income and housing. Mother was required, *inter alia*, to complete a protective

parenting evaluation and follow recommendations, and to maintain stable income and housing.

As to housing and employment, Ms. Fortun described Parents' housing and employment as "unstable and inconsistent." N.T., 3/20/23, at 64. Parents had been evicted and, after living for several months in Father's van, had resided the last month in an extended stay motel.[9] *See id.* at 65-66, 68-69, 74-75, 83-84, 93, 97, 99-101. Notably, Ms. Fortun testified that, until inquiry by the court, she had been unaware of Parents' current living arrangements. *See id.* at 64, 74. Further, Father had numerous jobs throughout the pendency of the matter. Nevertheless, Ms. Fortun indicated that he never provided her with paystubs. *See id.* at 64. While Ms. Fortun confirmed that Father advised JusticeWorks that he had secured employment with the United States Postal Service, she attested that she had no direct knowledge of Father's claimed employment, and JusticeWorks was unable to verify the same. *See id.* at 65, 80. As for Mother, she left a full-time job for a part-time job and similarly refused to show the Agency any paystubs. *See id.* at 75, 97-98. Ms. Fortun testified that both Mother and Father refused to execute releases in furtherance of JusticeWorks aiding them in obtaining employment and housing. *See id.* at 64, 75.

---

[9] Mother testified that she lived with her mother for a month to a month and a half following eviction and prior to residing in Father's van. N.T., 3/20/23, at 84.

Moreover, the record reflects that Father did not complete a sex offender treatment program. *See id.* at 36-37, 71, 79. Despite completing an evaluation and commencing a sex offender treatment program with Dynamic Counseling Associates in December 2020, Father was discharged in March 2022 due to threatening behavior in a group session.[10] *See id.* at 11, 14-17, 21, 36-37; *see also* Agency Exhibits 2 (Treatment Progress Summary) at 1 (unpaginated) & 3 (Discharge Summary) at 1, 3-4 (unpaginated). As described by Ms. Fortun:

> [O]ne of the biggest concerns that the Agency had was obviously [Father's] inability to complete sex offender treatment. . . .[H]e was unsuccessfully discharged, and he declined to me on several occasions to make a referral for him to engage in that treatment with a different provider. So[,] at this time, he has still not completed that service.

N.T., 3/20/23, at 71. Ms. Wogenrich, a therapist who worked with Father in both individual and group therapy, testified that he initially made "some progress." *Id.* at 11. However, following his first therapeutic polygraph in June 2021, Father "pulled back" and became "defensive" and "elusive." *Id.* Father then missed his second therapeutic polygraph, eventually scheduled for March 2022, as well as a subsequent group session. *See id.* at 15; *see also* Agency Exhibit 3 (Discharge Summary) at 3 (unpaginated). Ms. Wogenrich indicated that while Father completed bookwork, he was having

---

[10] Father remarked during a group session that he had a license to carry a gun. *See* N.T., 3/20/23, at 16, 21; *see also* Agency Exhibit 3 (Discharge Summary) at 3 (unpaginated).

difficulty applying what he was learning. *See id.* at 17-18, 20-21. She stated, "He was completing the chapters in the book, like he would fill out yes or no answers, but when talking about his own experiences, he was not implementing what he was learning." *Id.* at 21. This was confirmed by Ms. Flesichman, who supervised Ms. Wogenrich and was privy to Father's progress. Ms. Flesichman observed, "[S]ome areas that [Father] struggled in were to kind of dig deeper to understand why he engaged in sexual offending. Oftentimes, he would use alcohol as the excuse and not offer much more with regard to what other factors were going on for him as to why he sexually offended." *Id.* at 34-35. As Father was not a convicted sex offender, Ms. Wogenrich additionally related that Father "had always seen himself as different, which had created kind of this divine understating that he didn't think he was appropriate for the program." *Id.* at 13-14. Based on Father's lack of progress, assuming that he had not engaged in further treatment, Ms. Wogenrich indicated that she would not recommend Father have unsupervised contact with minors. *See id.* at 19-20. Father acknowledged his discharge and indicated that he was only willing to proceed with treatment of his choice. *See id.* at 115-16, 123-24. He further noted substance use as the only reason for any past sexual transgressions. *See id.* at 127.

Likewise, Mother did not complete a protective parenting program. *See id.* at 79. Following evaluation in September 2020, Mother engaged in a protective parenting program with Dynamic Counseling Associates. She

however made no progress and was unsuccessfully discharged by mid-January 2022 and declined to re-engage. *See id.* at 71-72, 74-75; *see also* Permanency Review Order, 1/19/22. Specifically, Ms. Fortun testified that Mother refused to believe the validity of Father's indicated status from 2012. Mother further struggled with boundaries with Father and was unwilling to separate from Father. *See* N.T., 3/20/23, at 72-74. Thereafter, Mother eventually re-engaged with a different provider, Valliere & Counseling Associates, Inc., in October 2022 and was discharged in March 2023. *See id.* at 75-76. When asked why Mother was again unsuccessfully discharged, Ms. Fortun explained as follows:

> Well, she had missed several -- four sessions. She attended nine. She missed four. And they identified that she was very resistant to treatment. She was unable to provide any treatment goals. She refused to explore any concerns regarding [Father's] indicated status. She minimized her risks to her children and continued to make excuses for her actions.
>
> She refused to address the recommendation outlined in the evaluation or the referral about her case. When she would be addressed on these issues during therapy, she would become angry, frustrated. She stomped out of the office space on several occasions. She demonstrated difficult behaviors, defiance towards treatment.
>
> She was very fixated on her negative feelings toward [the Agency], saying multiple times she was going to take them down rather than working on her work to obtain custody back of her daughter.
>
> She reported in therapy that she believed that if she retaliated against [the Agency], this would assist her with getting her daughter back. And she reported to her therapist on several occasions that she had no intention or interest in separating herself from [Father].

The therapist had reported that [Mother] places her own needs and wants above those of her own children. And she believed that she knows how to keep her children safe, but she has not demonstrated that in any words, actions, or behaviors.

She had not made any progress in treatment. Her prognosis is poor and will remain poor until she is able to work on her treatment goals and accept accountability or at least show a willingness to develop skills to keep her children safe.

*Id.* at 76-77; *see also* Agency Exhibit 10 (Treatment Progress Letter). At the hearing, Mother remained defiant and testified that she knows how to protect her children and does not need protective parenting. *See* N.T., 3/20/23, at 91, 95-96 ("I don't feel I need a protective parenting class[] because I do know how to protect my children . . . with what I've been through as a child, so I know all the warning signs and all the red flags.").

Based on the foregoing, we discern no abuse of discretion by the court in concluding that termination pursuant to Section 2511(a)(2) is warranted. The record substantiates the conclusion that Parents' repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Parents cannot or will not remedy this situation. *See id.* Parents failed to comply with their objectives in furtherance of reunification causing Child to be without essential parental control or subsistence necessary for her physical and mental well-being. Further, their testimony reveals a continued lack of insight that belies any suggestion of future compliance and progress. As this Court has

stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we next must determine whether termination was proper under Section 2511(b), which affords primary consideration to the developmental, physical and emotional needs and welfare of the child. *See T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (internal citations omitted). As our Supreme Court recently explained in *Interest of K.T.*, ___ A.3d ___, 2023 WL 4092986, *18 (Pa. June 21, 2023), "a court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize that analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *K.T., supra* (emphasis added).

- 17 -

In addition, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." **Id.** While not inventing an exhaustive list of considerations, the Court explained that the inquiry **must consider and weigh** certain evidence **if it is present in the record**, including, but not limited to, "the child's need for permanency and the length of time in foster care . . .; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id.** (footnote omitted); **see also id.** at n.28 (emphasis in original).

In concluding that termination of Parents' parental rights best serves the Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the orphans' court stated:

. . .

5. The termination of Mother's and Father's parental rights to [Child] would best serve her developmental, physical and emotional needs and welfare. 23 [Pa.C.S.A. § 2511(b).]

6. [Child's] half-brother and his girlfriend are providing for [Child's] daily needs and are willing to be an adoptive resource for [Child].

. . .

8. It appears that freeing [Child] for adoption will best address permanency for her, in affording for h[er] needs and welfare.

. . .

Findings of Fact and Conclusions of Law, 4/18/23, Conclusions of Law. The court recognized that Child had been placed since December 2020. **See id.**,

Findings of Fact, at ¶ 62. The court further found that Child was currently in a pre-adoptive placement with her half-brother and his family, with whom she was bonded and referred to as mommy and daddy, and who were providing for her needs. *See id.* at ¶¶ 63, 64, 65, 66, 68. As such, the court determined, "[C]hild's need for permanency far outweighs the attachment that [C]hild may still have to Mother and/or to Father." *Id.* at ¶ 72.

Father argues that he has a bond with Child, which, combined with his efforts at reunification, outweighs termination of his parental rights. He maintains, "This bond, coupled with the above-recited efforts of Father toward reunification and efforts to comply with all the Agency's directives, outweigh the [orphans'] court's determination that the termination of Father's rights would best serve the developmental, physical, and emotional needs and welfare of [Child]." Father's Brief at 17.

Similarly, Mother highlights her bond with Child and the importance of their relationship. She asserts that maintaining this relationship is in Child's best interests:

> It is undisputed that Mother and [C]hild have a bond of love and affection. Mother has maintained consistent positive visits. [C]hild has other siblings who are part of her life. The relationship between Mother and [C]hild is important and necessary for the well-being of [C]hild. Severing this vital relationship is not in the best interests of [C]hild.

Mother's Brief at 19-20.

Upon review, we discern no abuse of discretion. The record supports the finding that Child's developmental, physical, and emotional needs and

- 19 -

welfare favor termination of parental rights pursuant to Section 2511(b). *See*

*T.S.M.*, 71 A.3d at 267.

It is undisputed that Parents maintained regular visitation which went well. However, visitations remained supervised, and Parents never progressed to unsupervised interactions with Child. *See* Permanency Review Orders, 10/11/22, 4/20/22, 1/19/22, 12/28/21, & 3/25/21. This lack of progress is particularly troubling since Child had been in care for over two years, since December 3, 2020, and in her current pre-adoptive kinship placement for almost one year at the time of the termination hearing. *See* N.T., 3/20/23, at 78-79. Specifically, Child was placed with her half-brother and his paramour, where, Ms. Fortun reported, she was doing well:

> [C]hild is doing very well in the home, has assimilated and has adjusted to it. [Child] recognizes her foster parents, her brother and paramour, as her mom and dad. She calls them mommy and daddy and has done that on, I would say, the last eight to nine home visits that I've been at the home personally and have witnessed that. The foster family takes her to the park, to vacations, the beach, the aquarium, out to eat. They spend holidays together. She thinks that is her biological family.

*Id.* at 78-79.

Given that Child had been placed for over two years, as well as Parents' lack of success with treatment, the guardian *ad litem* therefore opined that "the best interests and needs and welfare of [C]hild are served by terminating the parental rights." *Id.* at 82.

Accordingly, the orphans' court did not abuse its discretion in concluding that termination best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

For the foregoing reasons, we affirm the termination decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/13/2023